# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE-OPELOUSAS DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL ACTION NO. 08-00011** |
| **VS.** | **JUDGE DOHERTY** |
| **EMANUEL CHARLES, III** | **MAGISTRATE JUDGE METHVIN** |

### FINDINGS AND RECOMMENDATION ON MOTION TO SUPPRESS
**(Rec. Doc. 56)**

Before the undersigned is a motion to suppress filed by defendant Emanuel Charles, III.

An evidentiary hearing was held on April 30, 2009. For the following reasons, it is

recommended that the motion be denied in part and granted in part.[1]

## FINDINGS AND CONCLUSIONS

### Background

Charles is charged in a six-count indictment with the following: Count 1 - possession

with intent to distribute 50 grams or more of cocaine base or crack, 21 U.S.C. 841(a)(1) and

841(b)(1)A); Count 2 - possession with intent to distribute cocaine, 21 U.S.C. 841(a)(1) and

841(b)(1); Count 3 - maintaining a drug-involved premises, 21 U.S.C. 856(a)(2); Count 4 -

possession of ammunition by a convicted felon, 18 U.S.C. 922(g)(1); Count 5 - forfeiture of cash

proceeds of approximately $7,500.00, 21 U.S.C. 853; and, Count 6 - forfeiture of ammunition, 18

U.S.C. 924(d)(1).

---

[1]For purposes of the Speedy Trial Act, it is noted that an expedited, unofficial, transcript of the hearing was not received until May 29, 2009, and therefore the 30 days allowed for taking a pretrial motion "under advisement" did not begin to run until that date. *See* U.S. v. Harris, ___ F.3d. ___, 2009 WL 1065970, 4 (5th Cir.2009) (a magistrate judge taking a pretrial motion "under advisement" is subject to a statutory limit of thirty excludable days under the Speedy Trial Act, Title 18 USCA § 3161(h)(1)(H)). The court noted delay resulting from the filing of a pretrial motion through the conclusion of the hearing on ... such motion" is excludable for purposes of the Speedy Trial Act. 18 U.S.C. § 3161(h)(1)(D). Id. at 3. The court noted additionally, the exclusion implicitly extends to "that time after a hearing needed to allow the trial court to assemble all papers reasonably necessary to dispose of the motion, e.g., the submission of post-hearing briefs."

The indictment resulted from an incident which occurred on or about April 20, 2007, in Lafayette, Louisiana. Charles was initially stopped for traffic violations, including an alleged faulty license plate light, a seat belt violation, and a red light violation. It is undisputed that a some point in time after the stop, Charles ran from the scene of the traffic stop and was apprehended. Charles then allegedly made inculpatory statements in response to questioning that he was running "Because of what's in my car" and "The drugs in the box on the floor." Charles' vehicle was searched, and based on evidence found in Charles' vehicle, crack cocaine and baby bottle of promethazine, a search warrant was issued for Charles' apartment.

After a search of the apartment, a plastic bag was found containing powder cocaine and $7,500.00 in U.S. currency. In addition, several plastic bags were seized that contained cocaine residue, a "crack" rock, marijuana, a microwave plate, whisks, a digital scale containing cocaine residue, and bullets. After the search of the apartment, Charles allegedly made the statement that he "was taking the charge for his stuff." Based on the evidence seized from Charles' vehicle and apartment, the indictment was issued.

In his motion, Charles moves to suppress the physical evidence seized from his car, his alleged inculpatory statements, and the physical evidence seized from his apartment. Charles argues the traffic stop was impermissible under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), because there was no reasonable suspicion to justify it at its inception, and it was not reasonably related in scope to the circumstances which justified the stop. Defendant argues the officers searched his apartment prior to obtaining a search warrant, and the search warrant ultimately obtained was based on evidence seized from his car during the illegal stop and detention. Defendant further argues he was not given his Miranda warnings, and all inculpatory

statements resulting from his illegal stop and detention and the illegal search of his apartment must be suppressed.

### *Issues Presented*

The issued raised in defendant's motion to suppress were as follows:

I.  Did the officers violate Charles' constitutional right to be free from unreasonable searches and seizures when they stopped his vehicle for alleged traffic violations?

   A.  Was there reasonable suspicion to justify the traffic stop of Charles at its inception?

   B.  If so, was Charles' detention for the alleged traffic violations extended beyond the valid reason for the initial stop, so that it became an unconstitutional investigative detention?

II.  Did defendant sign a valid consent, or any consent, permitting the search of his vehicle?

III.  Did defendant's running from the scene constitute a new and independent cause for additional detention time?

IV.  Did the officers have probable cause to search the vehicle?

V.  Were Charles' inculpatory statements the fruit of an illegal stop and unconstitutional detention?

VI.  Was the physical evidence obtained from Charles' vehicle the fruit of an illegal stop and unconstitutional detention?

VII.  Was the physical evidence obtained from Charles' apartment seized either without a search warrant or pursuant to an invalid warrant based on illegally seized evidence?

### *Evidentiary Hearing*

Six witnesses testified at the evidentiary hearing. Testifying for the government were the following:

   1.  Agent John Rogers, Lafayette Metro Narcotics Task Force;

   2.  Agent Brent Taylor, canine handler for Lafayette Metro Narcotics Task Force;

3.      Agent John Kelly, Lafayette Metro Narcotics Task Force;

4.      Agent Kane Marceaux, U.S. Drug Enforcement Agency, Lafayette;

Testifying for the defendant were the following:

5.      Emmanuel Charles, III, defendant;

6.      Desire Shantal Richard;

The testimony of Agent Kent Goolsby, Lafayette Metro Narcotics Task Force, was

proffered by the government and accepted by the Court.

The government introduced as exhibits the following:

1.      Permission to Search form;

2.      Order for Search and Seizure with supporting affidavit for 330 Feu Follet Road, Apt. No. 302, in Lafayette, Louisiana;

3.      Adjudication of guilt of Emanuel Charles by City Court of Lafayette for seat belt violation and failure to obey traffic control signal;

4.      Dispatch calls among the agents John Rogers, Brent Taylor, and Kent Goolsby;

5.      Traffic citations issued to Emanuel Charles for running a red light and no seatbelt.

The defendant introduced the following exhibits:

1.      Traffic citation from Lafayette City Police to Emanuel Charles, III, on February 2, 2007, for illegal window tint;

2.      Order for Search and Seizure with supporting affidavit for 330 Feu Follet Road, Apt. No. 302, in Lafayette, Louisiana;

3.      Permission to Search form;

4.      Photographs of Charles' vehicle;

5.      Map of the Pinhook area where Charles' vehicle was stopped.

Each witnesses' testimony will be addressed in turn.

**Agent John Rogers** testified that on the night of April 20, 2007, he was conducting surveillance of Charles at this apartment, when he observed Charles leave the apartment and throw a garbage bag into the dumpster, and then place something in his vehicle. (Tr. 8, 9, 33)). Charles then went back into his apartment, then exited the apartment, got into his vehicle, a 1995 dark color Chevy Impala, and leave the apartment complex. (Tr. 8 - 9). Rogers radioed Agents Goolsby and Taylor that Charles was leaving, and Rogers and Goolsby began following Charles. (Tr. 9). During the course of following Charles, Rogers observed a license plate light violation, and a seat belt violation, and Taylor radioed a red light violation to Rogers. (Tr. 10). Rogers observed Taylor pull Charles' vehicle over approximately 50 to 60 yards after the light at the intersection of General Mouton and Pinhook. (Tr. 11). Rogers and Goolsby were driving two separate cars, and they stopped right past the light on the side of the office building because they thought Charles may have dropped something on the side of the road, but they didn't find anything. (Tr. 11). Taylor notified him via radio that written permission to search had been signed, about five minutes after Charles had been stopped by Taylor. (Tr. 12). At that time, Rogers and Goolsby approached Charles' vehicle on front from the rear, intending to begin searching the vehicle. (Tr. 13). Charles was standing next to Deputy Scott Haydel, who had arrived and parked his car in front of Charles' vehicle. (Tr. 13). Rogers opened the passenger side door to Charles' vehicle, and Goolsby opened the drivers' side door. Rogers observed a box on the floor, looked up at Charles, then looked back at the box, and Charles began running across Pinhook. (Tr. 14). Charles was pursued by Rogers, Goolsby, Taylor, and Haydel. (Tr. 14). Charles tripped and was physically restrained and everyone returned to the scene. (Tr. 15).

At that time, the officers shut the car doors, and Taylor ran his canine around the vehicle, and the dog alerted. (Tr. 15). Rogers and others began to search the vehicle, and Rogers located on the passenger side a box that contained approximately 9 ounces of crack cocaine and a baby bottle full of promethazine. (Tr. 16). Rogers then approached Charles and told him he would be applying for a search warrant for Charles' apartment at 330 Feu Follet. (Tr. 16). Goolsby stayed with Rogers, and the other officers and Rogers radioed for another deputy to respond to the apartment until the agents could get there. To Rogers' knowledge, nothing was searched prior to obtaining the search warrant, but when the apartment was searched there was powder cocaine, money, bullets, a ski mask, some paraphernalia associated with making crack cocaine, Pyrex, and a whisk. (Tr. 17). He thought the dumpster was searched, but he did not search it. (Tr. 17).

Rogers listened to a CD, Government's Exhibit No. 4, which was of the radio traffic of that night from the CAD system. (Tr. 18). Rogers interpreted the radio traffic as follows: Goolsby relaying to Rogers that Charles was not wearing his seat belt. (Tr. 25); Rogers observing that the license plate light on Charles' vehicle appeared to be not working (Tr. 26); that Goolsby was behind Taylor on Pinhook (Tr. 26, 27); that Rogers had passed Charles' vehicle between the intersection of South College at Pinhook, and the intersection of the street by Blue Dog Café, Firestone, and Zeus at Pinhook, and one of Charles' tail lights on his vehicle looked like it was flickering or dim. (Tr. 28); Rogers' observation that it appeared Charles' license plate light was back on, but that Charles was not wearing a seat belt (Tr. 30); Taylor's advise that he was going to be initiating a stop of Charles' vehicle, and that Charles' had ran the red light (Tr. 30); Taylor's advise that Charles had given written permission to search (Tr. 31); Taylor's

communication that there was foot pursuit of Charles (Tr. 32); Taylor's communication that there

was a canine alert on Charles' car and that illegal narcotics were recovered.  (Tr. 32).

On cross-examination, Rogers testified that he did not indicate that he personally

observed any of the alleged traffic violations in his affidavit for the search warrant, or the offense

report, but instead referred the reader to Taylor's narrative for the probable cause stop.  (Tr. 38).

Rogers testified he did not recall whether the windows on Charles' vehicle were tinted, and that

he was aware that there was a state law governing the degree of tint permissible on vehicle

windows.  (Tr. 39).  Rogers also testified that he stated, on radio, "I don't think he's wearing a

seatbelt.  (Tr. 42).

On redirect, Rogers testified that he was able to see inside the vehicle as he passed

Charles between the intersection of Pinhook and South College and the second intersection.  (Tr.

44 - 45).  Rogers testified it was approximately 9:30 to 10:00 p.m., and that he considered

Pinhook to be relatively well illuminated, and that the lighting was sufficient to see inside the

vehicle.  (Tr. 45 - 46).

**Agent Brent Taylor**[2] testified on April 20, 2007, he was contacted by Rogers to assist in

a traffic stop of Charles.  (Tr. 47).  Taylor testified he observed Charles commit the following

traffic violations prior to pulling him over: no license plate light, no seat belt, and running a red

light.  (Tr. 47).  He testified he saw the defendant run the red light a "couple of seconds" before

he turned on his emergency lights. (Tr. 47).  He testified he asked defendant to give him

---

[2]The government submitted pursuant to Fed.R.Crim.P. 16, in an abundance of caution after the hearing, a report and recommendation issued by Magistrate Judge Hill on a motion to suppress in United States v. Roger Joseph Fontenette,07-cr-60028, filed 8/25/2008, wherein Officer Brent Taylor's testimony was considered not credible.  The undersigned has read and considered the finding.

permission to search his vehicle, Charles did so, and he radioed dispatch that he had permission to search. (Tr. 49). Other officers arrived on the scene and opened the doors to Charles' car, when Charles bolted, and was apprehended. (Tr. 49). He ultimately cited defendant for running a red light and no seatbelt, but not for the tail light being out, because when he thumped the plate, the light came back on. (Tr. 50). Taylor observed Charles not wearing his seatbelt when Charles stopped for a red light at the intersection of Pinhook and University Avenue, and he could see through the tint on the car windows, as the store across the street illuminated the inside of Charles' vehicle. (Tr. 51). He stated "And I could plainly see the seatbelt and it went straight down and it wasn't across his shoulder." (Tr. 51). He testified Charles "told me he understood he was going to give me permission to search his vehicle and he signed the form." (Tr. 52). His canine conducted a perimeter sniff of the vehicle, and alerted to the presence of narcotics. (Tr. 52). Taylor assisted, with his canine, in the search of Charles' apartment, and no search took place prior to Rogers' obtaining the search warrant, and his dog alerted. (Tr. 53).

On cross-examination, Taylor testified he was directly behind Charles' vehicle near the intersection of University and Pinhook, and that was the first time he saw the license plate light out. (Tr. 55). He testified Charles' license plate came on when he thumped the license plate in order to show Charles it was out, after the stop. (Tr. 56). He testified Charles entered the intersection and ran the red light a couple of seconds before he turned on his emergency lights. (Tr. 56). Taylor admitted his testimony at the City Court trial for the traffic violations was that the traffic light turned red while Charles' vehicle was in the intersection, and that he had his overhead lights activated prior to Charles' vehicle entering the intersection. (Tr. 58). Taylor testified he did not say anything in his offense report about Charles' vehicle having tinted

windows. (Tr. 59). He wrote two traffic tickets, one for running a red light and one for a seat belt violation on the scene. (Tr. 60). He stopped writing the tickets when Charles fled the scene, and he thought it was odd Charles would sign a consent to search his vehicle and then run away. (Tr. 61). He had no idea why the traffic tickets were notarized four days after they were written. (Tr. 62). He asked Charles to move his vehicle to a safer location over the PA system. (Tr. 64).

After reading his prior testimony in the City Court proceeding, he remembered he testified his PA system was probably broken, and that he had probably hollered out of the window. (Tr. 64). He did not know the state seat belt statute provided that no vehicle, driver, or passenger in a vehicle shall be inspected, detained, or searched solely because of a seat belt violation. (Tr. 69).

On redirect, Taylor testified that he would need a light meter to measure the tint on the windows of Charles' car, and he did not have one. (Tr. 69). He testified nothing obstructed his view into the vehicle, and he had no problem observing the defendant not wearing his seat belt. (Tr. 69).

**Agent Kent Goolsby's** testimony was proffered and accepted. He would testify that he observed the violations mentioned on the audio disc [the seatbelt and license plate light violations], that he communicated with Rogers, and that he participated in the initial search of defendants' vehicle when the consent to search was obtained, but that prior to discovering anything in the vehicle, defendant fled and was apprehended. The officers did not resume the search of the vehicle until the canine alerted. At that point, he assisted Rogers in the search of the defendant's vehicle. And then the testimony would be the same thus forward as heard previously. (Tr. 70). An additional proffer was made, and was accepted, that he would testify to

the same five-minute time frame from when the stop was initiated to the point in time when Taylor radioed the other officers that permission to search form had been signed. (Tr. 74).

**Emmanuel Charles, III**, defendant, identified and testified he had received a ticket on or about February 2, 2007, for illegal window tint. (Tr. 77). He testified he was stopped by Officer Taylor on April 20, 2007. (Tr. 78). He paid the ticket for illegal window tint. (Tr. 78). Defendant also identified pictures of his vehicle taken approximately two days before the hearing, and stated the pictures reflected the condition of the car back on April 20, 2007, and he had done nothing to change or alter the window tint from April, 2007, until the date the pictures were taken. (Tr. 78).

Charles testified he left his apartment roughly around 9:30 or 9:45 that night, to go to the north side of town to meet some of his friends to go out. (Tr. 79). He was aware at the intersection of Pinhook and University that someone was behind him, and when he was at the light he saw a black and white police car coming pretty fast, and it ended up being maybe two cars behind him. (Tr. 80). When the light turned green, he noticed the police car went around cars to get behind him, and then put his lights on, approximately 150 feet from the intersection of Pinhook and General Mouton. (Tr. 82). When he saw the lights come on, he switched lanes and pulled to the side of the road. (Tr. 82). He said the police officer stated over his PA system to go up the road and turn onto the parking lot where it was safer, because there was no sidewalk where they were pulled over. (Tr. 82). Charles complied and crossed the intersection of Pinhook and General Mouton, where the light was green. (Tr. 83). He pulled over into the parking lot where a big yellow furniture place is. (Tr. 83). He testified that he got out of the car with his car papers and insurance, and Agent Taylor told him he just needed the license. (Tr. 83). After he

gave Taylor the license, Taylor told him he was stopping him because his license plate light was out. (Tr. 84). Agent Taylor told him he was running his name, and if it came back clean, he would let him go. Taylor then went to his car and spoke on the CB thing, and then came back to Charles' vehicle. (Tr. 84). Charles asked to see the license plate light, and when he did, Taylor ran around to the back of the car and starting hitting on the light. (Tr. 84). When Charles' looked at it, the light was on. (Tr. 84). Taylor told him it must have had a short in it. (Tr. 84).

Seconds thereafter, a sheriff car pulled up, with one person in the car, and he just got out and stood outside the car. Then another car, a grey Charger, pulled up with two people in it. Then, two guys walked up, one of then being Agent Rogers. (Tr. 85). Charles testfied that he did not know that night one of the men walking up was Agent Rogers, but only knew it because he recognized him in the courtroom. (Tr. 85). Charles said Agent Taylor, up to this point in time, had not talked to him about searching his vehicle or about giving consent for a search, but had only asked him if he had any drugs or weapons on his person, to which Charles responded no, and Taylor had patted him down. (Tr. 85). Charles testified Taylor did not, at any point in time, talk to him or ask him for consent to search his vehicle. (Tr. 85). Charles identified the consent to search form, and then stated that he was never presented with it after he was stopped and was on the scene at Pinhook Road, and that he did not sign that form. (Tr. 86).

Charles testified Agents Rogers and Goolsby were in civilian clothes when they walked up to him, and looked nothing like they looked in court at the hearing. (Tr. 87). They had on short sleeves and Rogers was full of tattoos, and Goolsby had piercings, they did not look like officers, and Charles did not think they were officers. (Tr. 88). Out of six people on the scene, only two had on uniforms. (Tr. 88). Charles testified he asked Agent Taylor what was going on,

but he did not say anything. (Tr. 89). Right before he decided to run, one of them had opened the door to his car, and going into his vehicle, and he ran after that. (Tr. 89). He tripped and was handcuffed. The guys in regular clothes pulled badges out from under their shirts, and asked him why he ran. (Tr. 89). Charles testified he stated he ran because he didn't know what was going on. (Tr. 90). The officer asked him what was in his car, to which he responded that if anything was in the car, the officers must have put something in it, and he had no clue about anything in the car. (Tr. 90).

After that exchange, the officers walked him across the street and put him in the back seat of the sheriff car. (Tr. 90). They were in the car looking all over, then they closed the doors and ran a dog around the car. (Tr. 90). Charles testified he did not see the dog do anything, and the officer never showed him anything they found in his car. (Tr. 90). Charles stated one of the officers walked to his car and told him they either knew were he was coming from or knew where he was going and they had called to get a search warrant from his apartment. (Tr. 90). Charles testified he was not advised of his rights at any point up to this time. (Tr. 90, 91).

Charles testified they drove him to his apartment prior to midnight, and when they arrived, a man in a sheriff uniform was standing outside his apartment, and about three persons wearing street clothes were on the inside of his apartment. (Tr.91). They walked him into the apartment, and he observed that they had basically already torn his apartment apart. (Tr. 92). They did not tell Charles they had found anything in the apartment, and they continued searching while he was sitting on his couch. (Tr. 92). Agents Kelly and Marceaux started asking him about people, and they asked him where anything was in the apartment. (Tr. 93). Charles stated he reponded by telling them they were wasting their time, and he had no idea what they were

talking about. (Tr. 93). They searched for approximately one and a half hours and didn't find anything in the apartment. (Tr. 93). They ran a dog around and they claimed it hit on a computer or something. Taylor played with the computer for at least an hour, and then he claimed he opened it and it had drugs and money in it. (Tr. 93). After Taylor said he found something, then Charles heard one of the other officers say "call for the warrant now." (Tr. 93).

He was brought downtown, not through the regular way, but through a sheriff's office, and he was threatened by Agent Kane Marceaux that federal charges would be put on him if he refused to cooperate. (Tr. 94). The officers showed him a warrant to search his apartment right before they left with him to bring him to jail. (Tr. 95).

On cross-examination, Charles testified he was going to meet some friends at a club on the night of his arrest. (Tr. 95). He denied that he was going to make a drop for narcotics. (Tr. 97). He testified that he saw the marked police car behind him before Taylor put his emergency lights on, but forgot to say he saw him prior to his putting the lights on at his City Court trial. (Tr. 100). Charles denied running the red light, and stated he did not recall whether he had his safety belt on or not. (Tr. 101). Charles testified that in City Court he also stated it was a possibility he did not have his safety belt on. (Tr. 101). Charles stated he did not give permission to search his vehicle, and it was a couple of minutes from the time he was stopped until the plain clothes officers walked up to him. (Tr. 102). Charles testified he ran because he was scared he was going to be tazed by the two "real cops" at the scene. (Tr. 103). He testified he ran not because he had cocaine in the car, but because he was in a secluded area by himself with two officers and four people he did not know. (Tr. 104). He saw a canine used. (Tr. 104). He acknowledged that the signature at the bottom of the consent to search form looked like his signature, but that he did

not put it there. (Tr. 105). He stated he had signed a permission form years before, but not on this particular night. (Tr. 105). He testified the consent form had the date 2006 on it, so he knew before this night he did sign one, but could not recall the exact date. (Tr. 105).

He testified that Agent Marceaux questioned him at his apartment, and threatened him if he did not cooperate, he was going to have federal charges brought. (Tr. 106). He testified that he did not recall if Agent Marceaux talked to him at the Sheriff's office, and believed he had testified on direct that he spoke with Agent Marceaux at his apartment. (Tr. 107).

On redirect, Charles testified it was the appearance of Agents Rogers and Goolsby, with their tattoos and piercings, and their comment to Charles when they walked up, that caused him to run from the scene. (Tr. 108).

**Desiree Richard** testified she grew up in church with Charles, and that she had known him for a long time. (Tr. 109). She was with Charles' ex-girlfriend, Teykeysha, at Teykeysha's house, and Charles called Teykeysha and told her the cops had stopped him and they had a warrant to search his car and apartment, and where he was. (Tr. 110). Teykeysha's house at that time was approximately five or ten minutes from the intersection of General Mouton and Pinhook, and that after they received the phone call, they were there in about three to five minutes, because it's not that far. (Tr. 112). When they got to the scene, they had Emmanuel in the back of the cop car. She got out of the car and asked if they were bringing Emmanuel to jail, and whether she could get his car. The officer told her the car was under investigation, and if she did not leave the scene, she was going to jail. (Tr. 112). They rode around some and watched, then went to Charles' apartment. (Tr. 112).

When they got to the apartment, it was blocked off, and there were cops in the apartment. (Tr. 112). It took them approximately ten, to fifteen, but not longer than twenty minutes to get to his apartment. (Tr. 113). She stayed watching the apartment for a good long while, and she saw officers bring Charles back to the apartment. She never got an opportunity to talk to Charles. (Tr. 113).

**Agent John Kelly**, on rebuttal, testified that he participated in the search of Charles' apartment, and a search warrant was obtained prior to searching the apartment. (Tr. 115). He helped secure the residence prior to the search warrant being obtained, but that the residence was not searched for narcotics. (Tr. 115). He was the secondary supervisor, and Sergeant Kirk Calarelli was the acting supervisor on the scene. (Tr. 115).

On cross-examination, Kelly testified he was not on duty, but was called in to help on the case. He received a call they had made a traffic stop and were planning to do a search warrant. (Tr. 116). He had not been involved in any surveillance of Charles' apartment prior to his traffic stop, and he did not know what time he arrived at the apartment, but it was after dark. (Tr. 116). He thought probably 10:30 or 11:00 p.m., if the traffic stop occurred around 10:00 p.m. (Tr. 117).

When he got to the apartment, there were other officers there, but he did not think anybody had entered the apartment yet. (Tr. 117). He thought they used Charles' keys to get into the apartment, which he assumed were seized at the traffic stop, but he was not 100% percent sure about using Charles' keys. (Tr. 117). He had, prior to April 20, 2007, given information to others that Charles was a drug dealer, he was aware that there had been previous surveillance of Charles' apartment, and he had discussed Charles with Agent Rogers. (Tr. 118). He did not

know how many officers were at the apartment before he arrived there, but he thought there were a couple, and he was pretty sure that there was nobody in the apartment when he arrived. (Tr. 119).

On examination by the undersigned, he testified the other officers were in the parking area outside the apartment door, in front of the apartment. (Tr. 119). He believed one of the other two officers had the key to the apartment from the traffic stop, and they opened the door with it. (Tr. 120). He was in charge when he initially arrived on the scene, but then Sergeant Calarelli arrived shortly thereafter, and then he was in charge. (Tr. 120). Sergeant Calarelli was on the scene and in charge when the keys showed up. (Tr. 121). They did not move into the apartment right away. (Tr. 121). They went there to wait for the search warrant to be signed, and once the search warrant was signed, then they proceeded to search. (Tr. 121). The officers were in the apartment when the search warrant was signed, and the defendant was sitting on the couch. (Tr. 122).

He testified his role prior to the search warrant being obtained was to secure the area, which entailed making sure no one outside of law enforcement officers were there, as well as the suspect, and that no one left with anything of evidentiary value. (Tr. 122). He estimated it took approximately 45 minutes to an hour for the warrant to be signed. (Tr. 122). Sergeant Calarelli was in charge when the search warrant was signed, and he gave the instruction to commence the search. (Tr. 123).

**Agent John Rogers**, on rebuttal, testified after he was apprehended, Charles was asked why he ran, and he responded "well, what's in the car" or "I ran because of what's in the car." (Tr. 124). On cross-examination, Rogers testified Taylor asked Charles the question. (Tr. 124).

Agent Rogers testified he did not hear anyone advise Charles of his rights prior to questioning him. (Tr. 124).

Agent Rogers did not go back to the apartment. He went and typed the search warrant. (Tr. 124). He did not have the keys to the apartment, but someone did. (Tr. 124). He does not know how the officers got in the apartment, but he was told they used the key. (Tr. 125). After he got the warrant, Rogers went to the apartment. Officers were in the apartment when he got there. There was no search for illegal narcotics prior to his arrival at the apartment, but he knew they went through the apartment to make sure there was nobody in the apartment, but other than that, no other search. (Tr. 125). He testified he was not at the apartment for all the time that passed, and he never went back to the apartment until he actually had the search warrant. (Tr. 125).

**Agent Kane Marceaux**, Drug Enforcement Agency, testified he became involved in the investigation of Charles when he received a phone call from Agent Kelly, sometime after 9:00 p.m. (Tr. 126). He drove to Charles' apartment after he received the phone call, with his date. (Tr. 126). He entered the apartment and spoke with Kelly. The residence had not yet been searched, and they were waiting on the search warrant. (Tr. 127). Charles was sitting on the couch. (Tr. 127). He did not question Charles, but told him that he would be possibly be facing some federal charges. (Tr. 127). He stated it takes less than ten minutes to get from the location where Charles was stopped, Pinhook at General Mouton, to Charles' apartment on Feu Follet Road. (Tr. 128). He was still at the apartment when the agents returned with the search warrant, and he waited at the apartment for less than an hour for the search warrant to arrive. (Tr. 128).

On cross-examination, Agent Marceaux testified when he arrived at the apartment, officers and Charles were both inside the apartment, but he did not know how long officers had been in the apartment. (Tr. 129). He was not there to see what the officers did prior to his arrival. (Tr. 129). He had been involved in earlier surveillances of Charles' apartment, and he never actually observed any illegal activity, nor defendant, at the apartment. (Tr. 129, 130). Prior to the traffic stop, Charles was already a person of interest to Agent Marceaux and the Task Force. (Tr. 130).

On redirect, he testified the time from the location of the traffic stop to the judge's house and back would be close to an hour round trip. (Tr. 131).

## *Analysis*

## Suppression of Physical Evidence Seized

The key issue in this matter regarding suppression of the physical evidence seized is whether the initial stop of defendant for traffic violations and subsequent search of his vehicle was valid under the Fourth Amendment. If the traffic stop and search of Charles' vehicle was valid, then there is no basis to suppress the physical evidence seized therein, the crack cocaine and baby bottle of promethazine. Likewise, if the stop and seizure were valid, there is no basis to suppress the evidence seized at Charles' apartment pursuant to the search warrant, which was issued based on the evidence seized from the vehicle.

The Fourth Amendment protects individuals against unreasonable searches and seizures, and traffic stops are deemed seizures for purposes of the Fourth Amendment. United States v. Valadez, 267 F.3d 395, 397 (5th Cir. 2001). The legality of a traffic stop is analyzed under the two-part test set out in Terry v. Ohio, 392 U.S. 1, 20 L.Ed.2d 889, 88 S.Ct. 1868 (1968). Under

Terry v. Ohio, 392 U.S. 1, 22-24, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), a police officer may stop an individual reasonably suspected of criminal activity, question him briefly, and perform a limited pat-down frisk for weapons. The permissibility of such an investigatory stop is determined by balancing  the intrusion on the individual's Fourth Amendment rights against the officer's need to search or seize. Id. at 21. Under this approach, such an intrusion is justified if the police officer can point to "specific and articulable facts" which, taken together with rational inferences from those facts, warrant the intrusion. Id.  Under the Terry test, an officer's actions must be 1) "justified at its inception" and 2) "reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 19-20.

**1)      Was the traffic stop of Charles justified at its inception?**

A traffic stop may be pretextual, but must be justified at its inception.  Whren v. United States, 517 U.S. 806 (1996).  The constitutional reasonableness of traffic stops does not depend on the actual motivations of the individual officers involved. Whren v. United States, 517 U.S. 806, 808, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89 (1996).  In order for a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some type of illegal activity has occurred or is about to occur, prior to stopping the vehicle.  United States v. Lopez-Moreno, 420 F.3d 430 (5th Cir. 2005).  However, reasonable suspicion does not need to rise to the level of probable cause to justify a traffic stop.  Id.

In this case, the government concedes the defendant had been under surveillance for drug trafficking, and the traffic stop was a pretext.  Three traffic offenses are at issue: 1) not wearing a seat belt; 2) a faulty license plate light; and 3) running a red light.  Defendant was convicted of not wearing a seat belt and running a red light in Lafayette Traffic Court.  He was not cited for a

faulty license plate light, as, according to the testimony of Agent Taylor, because when Agent Taylor thumped the plate, the light came back on. (Tr. 50).

Regarding the first offense, no seat belt, defendant testified he did not recall whether he had his safety belt on or not. (Tr. 101). Charles testified that in traffic court he also stated that it was a possibility that he did not have his safety belt on. (Tr. 101). While the vehicles windows were illegally tinted, the officers' testimony that they could see in the windows enough to note that his seat belt was not being used was credible, and corroborated by each other and the recording of the radio traffic of that night from the CAD system. And, again, defendant conceded that it was at least possible he was not wearing his seat belt. (Tr. 101).

As to the second offense, the faulty license plate light, the officers testified the light probably had a short in it, because it lit up after being tapped, while defendant states that was not the case. This alleged violation was the weakest of the pretexts, but it is somewhat bolstered by the recording of the radio traffic and the conversations between the officers as to what they were seeing the night of the traffic stops.

Regarding the third offense, running the red light, Officer Taylor testified Charles entered the intersection and ran the red light a couple of seconds before he turned on his emergency lights. (Tr. 56). He admitted that his testimony at the City Court trial for the traffic violations, was that the light turned red while Charles' vehicle was in the intersection, and that he has his overhead lights activated prior to Charles' vehicle entering the intersection. (Tr. 58). As is the case with the seat belt violation, the officers testimony was corroborated by the radio traffic, and Officer Taylor's statement regarding the light violation as it occurred.

Thus, the undersigned finds the traffic stop of defendant was justified at its inception, and the first prong of the Terry analysis has been met.

2.      **Was the stop reasonably related in scope to the circumstances which justified the interference in the first place?**

Generally, for a traffic stop to be reasonably related in scope to the circumstances which justified it in the first place, the detention must be temporary, and last no longer than necessary to effectuate the purpose of the stop.  United States v. Lopez-Moreno, 420 F.3d 430 (5th Cir. 2005). This includes the time it takes to check a driver's license and vehicle registration, and run a search to check for outstanding warrants or whether the vehicle is stolen.  Id.  During the time waiting for the driver's license and registration check, the officer may question the driver on subjects not related to the traffic stop.  Id.  If during the course of the stop, before the initial purpose of the stop has been fulfilled, additional reasonable suspicion arises, the detention may be continued until the new reasonable suspicion has been confirmed or denied.  Id.

The undersigned finds the detaining officer, Agent Taylor, obtained a valid consent form from defendant shortly after the initial stop.  Agent Rogers testified that Agent Taylor notified him via radio that written permission to search had been signed, about five minutes after Charles had been stopped by Officer Taylor.  (Tr. 12). Agent Kent Goolsby's testimony was proffered and accepted that he would confirm the same five-minute time frame from when the stop was initiated to the point in time when Officer Taylor radioed the other officers that permission to search form had been signed.  (Tr. 74).

The defendant's testimony that he did not sign the consent form was not credible, as the signature on the consent to search is virtually identical to his signature on his bond and on his

affidavit. Defendant conceded that it, in fact, appeared to be his signature, but he claims that it must be an old consent form, and points out in support of this testimony that instead of being correctly dated April 20, 2007, it is incorrectly dated April 20, 2006. (Tr. 105). The undersigned finds this testimony incredible, and that defendant did indeed consent to the search of his vehicle on April 20, 2007, and from that point the officers were authorized to search and seize the drugs in defendant's vehicle. Thus, the evidence was lawfully seized from Charles' vehicle, and there is no basis upon which to suppress the crack cocaine or the promethazine.

The defense's argument in support of the suppression of the evidence seized from the apartment is primarily based upon the basis of the warrant, the evidence seized from the vehicle, being unlawfully obtained. However, as discussed above, the evidence was lawfully seized from the vehicle, and thus the argument that the search warrant was based on unlawfully obtained evidence is without merit, and offers no basis for suppression of the evidence seized in the apartment.

While not addressed in his motion, at the suppression hearing, defendant offered testimony and appeared to argue his apartment was searched and evidence seized prior to obtaining the warrant. The testimony of the officers was credible that no search for narcotics occurred prior to obtaining the search warrant, although a search to secure the premises did occur prior to Agent Rogers obtaining the search warrant. Rogers testified he knew the officers went through the apartment to make sure there was nobody in the apartment, but other than that, no other search was made. (Tr. 125). Agent John Kelly, Lafayette Metro Narcotics Task Force, testified he participated in the search of Charles' apartment, and a search warrant was obtained prior to searching the apartment. (Tr. 115). He testified that he helped secure the residence prior

to the search warrant being obtained, but that the residence was not searched for narcotics. (Tr. 115). Charles' testimony that officers were in his apartment and had "basically already torn his apartment apart" when they brought him to the apartment, and then only called for a warrant when they had found drugs and money in a computer, (Tr. 91, 92, 93), is simply not credible, and not corroborated by any of the testimony of the officers. Desiree Richard testified that when she got to Charles' apartment there were officers inside, but she stated she was not able to see specifically what they were doing. (Tr. 113). The undersigned finds the search of defendant's apartment was conducted pursuant to a valid search warrant, and there are no grounds to suppress any of the evidence seized therein.

**Suppression of Inculpatory Statements Made**

Remaining at issue are the alleged inculpatory statements made by defendant, which defendant denies he made. The first statements allegedly made are "Because what's in my car" and "The drugs in the box on the floor," both said in response to a question by Agent Taylor after defendant was detained and handcuffed by officers after he fled from the scene. The third statement "Taking the charge for my stuff" was allegedly made at the apartment.[3]

The Fifth Amendment guarantees that no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST., AMDT. 5. The Clause bars the introduction at trial of involuntary confessions made in response to custodial interrogation. The privilege against self-incrimination is enforced in part by the judicially-created *Miranda* warning requirement. Miranda v. Arizona, 384 U.S. 436 (1966). *Miranda* requires that during *custodial interrogations,*

---

[3]See *Affidavit in Support of Motion and Incorporated Memorandum to Suppress Inculpatory Statements and Physical Evidence, Defendant's Exhibit A to Memorandum in Support of Motion to Suppress Physical Evidence and Inculpatory Statements and Request for Hearing* (rec. doc. 56-3).

certain procedural safeguards be used to protect an individual's privilege against self-incrimination.  An individual must be warned before interrogation that (1) he has the right to remain silent; (2) that any thing he says can be used against him in a court of law; (3) that he has the right to the presence of an attorney; and (4) that if he cannot afford an attorney one will be appointed for him prior to any questioning if he desires.  Id. at 478-79.  The individual can then waive those rights, but failure to advise the individual of these rights will result in the exclusion at trial of any subsequent statements made by the individual at that interrogation.

Custodial interrogations place "inherently compelling pressures" on the persons interrogated.  Miranda v. Arizona, 384 U.S. 436, 467 (1966); Thompson v. Keohane, 516 U.S. 99 (1995).  *Miranda* warnings are required, however, "only where there has been such a restriction on a person's freedom as to render him 'in custody.' " Oregon v. Mathiason, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977) (per curiam); *see also* Stansbury v. California, 511 U.S. 318, 322, 114 S.Ct. 1526, 1528, 128 L.Ed.2d 293 (1994) (per curiam). A " custodial interrogation" is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda, 384 U.S. at 444; Mathiason, 429 U.S. at 495.

At the suppression hearing, both parties appeared to have forgotten the motion to suppress covered not only physical evidence, but also the alleged inculpatory statements.  During closing argument, counsel for defendant (who was not original counsel who filed the motion to suppress) stated "I honestly don't remember if the Motion to Suppress addressed statements, but I don't think I ever heard anybody testify that they had advised him of any Miranda Warnings whatsoever prior to any inculpatory statements they attribute to him.  All of the statements were

in response to questions.  None of the statements were identified as spontaneous utterances."
(Tr. 137).  The government offered no argument in opposition to the motion to suppress the
inculpatory statements.  It its brief in response to the motion to suppress, the government stated it
could not respond to the request to suppress inculpatory statements because the defendant had
not offered any law or reason in support of its request.  At the hearing, the government did not
solicit testimony from any of its witnesses that defendant was ever advised of his *Miranda* rights,
nor did counsel argue at closing that defendant was ever advised of his *Miranda* rights.

Custodial statements are not Miranda-protected unless they are made as the result of
"interrogation" by law enforcement.  <u>Miranda</u>, 384 U.S. at 478, 86 S.Ct. 1602.  Interrogation is
defined as "express questioning or its functional equivalent," which are "words or actions on the
part of the police. . . .that the police should know are reasonably likely to elicit an incrimination
response form the suspect." <u>Rhode Island v. Innis</u>, 446 U.S. 291, 300-301 (1980).

It is not disputed that after Charles ran during the traffic stop and was apprehended, he
was in custody. According to the testimony of defendant, he tripped and was handcuffed. (Tr.
89).  The undersigned also finds Charles was interrogated, as he was expressly questioned  at the
traffic stop and at his apartment.

At the traffic stop, Agent Rogers testified after Charles was apprehended, Charles was
asked by Agent Taylor why he ran, and Charles responded "well, what's in the car" or "I ran
because of what's in the car."  (Tr. 124).  The undersigned finds Agent Taylor should have
known his question to Charles as to why he ran was likely to elicit an incriminating response, as
Charles ran after the agents began searching his car.

At the apartment, defendant testified Agents Kelly and Marceaux started asking him about people, and they asked him where anything was in the apartment. (Tr. 93). The undersigned likewise finds these agents should have known their questioning of Charles regarding the contents of his apartment and his associations would have been likely to elicit an incriminating response, even one of defiance, such as Charles' alleged statement that he was "taking the charge for my stuff."

Agent Rogers testified he did not hear anyone advise Charles of his rights prior to Charles' being questioned at the traffic stop. (Tr. 124). Charles also testified he was not advised of his rights at any point up to this time. (Tr. 90, 91). Although Agent Rogers stated in his affidavit for the search warrant that Charles was detained and Mirandized after a brief foot pursuit, his testimony at the hearing, as summarized above, was that he did not hear anyone advise Charles of his rights prior to the initiation of questioning at the traffic stop. (Tr. 124). The undersigned has reviewed the transcript of the suppression hearing, and has found no testimony by any agent that Charles was ever advised of his *Miranda* rights, either at the traffic stop or subsequently.

The weight of the evidence and testimony is that Charles was not advised of his *Miranda* rights after he was handcuffed and detained, and the alleged inculpatory statements were made in response to interrogation. Therefore, it will be recommended that any alleged statements made by Charles after he was handcuffed at the scene of the traffic stop be suppressed as obtained in violation of his *Miranda* rights.

## CONCLUSIONS AND RECOMMENDATION

The undersigned concludes the initial traffic stop of Charles was constitutional, as there was reasonable suspicion to justify the traffic stop at its inception. Furthermore, the detention of Charles was not extended beyond the valid reason for the initial stop, and during that time period, Charles signed a valid consent to search form. Therefore, the motion to suppress the physical evidence seized from the vehicle should be denied.

The undersigned also concludes the search of Charles' apartment was pursuant to a valid search warrant, which was supported by evidence seized from Charles' vehicle, and the motion to suppress the physical evidence seized from the apartment should also be denied.

Finally, the undersigned concludes the alleged inculpatory statements made by Charles were given during custodial interrogation without Charles having been advised of his *Miranda* rights, and the motion to suppress the inculpatory statements made by Charles should be granted.

For the reasons given above,

**IT THE RECOMMENDATION** of the undersigned that the Motion to Suppress Physical Evidence and Inculpatory Statement and Request for Hearing (rec. doc. 56) be **GRANTED IN PART AND DENIED IN PART** as follows:

1) The motion to suppress all physical evidence seized be **DENIED**;

2) The motion to suppress all inculpatory statements be **GRANTED**.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and Fed.R.Civ.P. 72(b), the parties have ten (10) days from receipt of this Report and Recommendation to file specific, written objections with the Clerk of Court. Counsel are directed to furnish a courtesy copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within ten (10) days following the date of receipt, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error.  See **Douglass v. United Services Automobile Association**, 79 F.3d 1415 (5th Cir.  1996).

Signed at Lafayette, Louisiana, on June 15, 2009.

Mildred E. Methvin
United States Magistrate Judge
800 Lafayette St., Suite 3500
Lafayette, Louisiana 70501
(337) 593-5140 (phone) 593-5155 (fax)